**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

ALONDA W.,[1]

Plaintiff,     3:18-cv-01095 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,[2]

Defendant.

**Appearances:**

*For Plaintiff:*
Scot G. Miller
Coughlin & Gerhart, LLP
P.O. Box 2039
Binghamton, NY 13902

*For Defendant:*
Grant C. Jaquith
United States Attorney
Alexander Broche
Special Assistant United States Attorney
Social Security Administration
26 Federal Plaza
New York, NY 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.     **INTRODUCTION**

Plaintiff Alonda W. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security denying Plaintiff's application for Social

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

[2] Andrew Saul became the Commissioner of Social Security after this case was filed. (Dkt. No. 13, at 1). Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to add his name to the docket.

Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 12, 14). After carefully reviewing the Administrative Record,[3] (Dkt. No. 8), and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for SSDI benefits on December 12, 2014, alleging that she had been disabled since September 15, 2013. (R. 68–69, 185). Plaintiff later amended the disability onset date to October 7, 2014. (R. 205). The Commissioner denied the claim on February 17, 2015. (R. 68–78). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge ("ALJ") Gretchen Mary Greisler on February 21, 2017. (R. 46–67). A supplemental hearing with an impartial medical expert was held before ALJ Greisler on July 11, 2017. (R. 33–44). On July 31, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 7–26). Plaintiff then filed a request for a review of that decision with the Appeals Council, which denied review on July 17, 2018. (R. 1–6). Plaintiff commenced this action on September 13, 2018. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff was 57 years old when she applied for SSDI benefits in December 2014. (R. 68). She completed two years of college. (R. 53). She is divorced and has three adult children. (R. 52). She lives by herself. (*Id.*). She has a driver's license but was told she was not allowed to drive by her doctor because of her seizures. (*Id.*). Her parents or her children drive her when

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 8), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

needed. (*Id.*). "Once or twice a month" she gets out of the house and goes "grocery shopping and [to the] doctors." (R. 53).

Plaintiff testified that she has not worked since her alleged onset date of disability in October 2014. (R. 54). She previously held various jobs—including as a customer service manager, administrative assistant, and assisting disabled individuals with gardening. (R. 54–56). In September 2013, she was let go from her previous job as a customer service manager when the company downsized. (R. 57). After being laid off, Plaintiff went to the Department of Social Services to see if she "could get some help." (R. 58). While there, the woman she talked to told her she "would be scrutinized and [her] home" would have liens put on it and she "would be looked at for fraud." (*Id.*). When Plaintiff was "trying to sign the paperwork . . . all of a sudden, each signature started looking different," and she "just started going into a seizure." (*Id.*). An ambulance took her to the hospital. (*Id.*). Plaintiff testified that "[n]othing like that had ever happened" before. (*Id.*). She was hospitalized for two days. (*Id.*).

While at the hospital, Plaintiff was treated by several doctors, including Dr. Yahia Lodi. The doctors "decided that it might be" psychogenic non-epileptic seizures ("PNES"). (R. 59). Plaintiff returned to the hospital later that month, when her "whole body was going paralyzed and [she] just couldn't control it." (*Id.*). She has continued to see Dr. Lodi about every six months since then. (*Id.*). She reports that the "seizures come usually once a week," though sometimes more often. (*Id.*). "[S]tress can make them come on faster." (*Id.*). Typically, the seizures start by Plaintiff "feel[ing] pins and needles in [her] feet and in [her] hands and then all of a sudden numbness will come over [her] legs and up in [her] arms." (*Id.*). Plaintiff needs to "find a place to sit down or just simply lay on the floor." (R. 59–60). Her eyes flutter and she cannot talk, but she can hear. (R. 60). This "usually lasts anywhere from 5 to 20 minutes." (*Id.*).

Once these symptoms subside, Plaintiff is "exhausted" and her "brain doesn't feel like [she] can remember words." (*Id.*).

Since the seizures began, Plaintiff avoids going out in public because she "doesn't want to draw attention" to herself if she has a seizure. (R. 61). Plaintiff testified that while she used to volunteer at a horse farm, she stopped volunteering in probably "either 2011 or 2012," though she was "not sure what year it was." (R. 63–64).

### C.    Medical Evidence and Opinions

#### 1.    Dr. Yahia Lodi

Dr. Lodi, a neurologist, has been treating Plaintiff since 2014. (R. 287, 409). When Plaintiff was first admitted to the hospital in October 2014, she was treated by Drs. Sy Heustein and Yahia Lodi. (R. 283–287, 409, 430). While at the hospital, Plaintiff had "three episodes of what appeared to be syncopal events." (R. 284). Both of her legs became weak, and she "appeared to lose consciousness, but would lower herself down on the floor." (*Id.*). While she "seem[ed] to be unresponsive," and her eyelids fluttered, she was "able to communicate while her eyes [were] closed." (*Id.*). These episodes lasted "one to two minutes." (*Id.*). Plaintiff seemed to "recover[] completely after these events with no postictal confusion." (*Id.*). These episodes were "witnessed by multiple health care providers,[4] who seem[ed] to be in general agreement that the[y] do not present true seizure-like activity or true syncopal events," but rather "functional pseudosizure[s]." (R. 284, 409). An echocardiogram, an EEG, and CT scan were normal. (R. 284–85). An MRI "revealed nonspecific hyperdensities in the brain parenchyma." (R. 285). Plaintiff was discharged with a plan to follow up with Dr. Lodi in six months. (R. 286).

---

[4] Dr. Lodi was among those who observed these seizures. (R. 409).

Plaintiff returned to the hospital on October 27, 2014. (R. 291). She reported that "her attacks of numbness and paralysis [were] more frequent" and "lasting longer." (R. 414). Dr. Heustein reported that Plaintiff had experienced "bilateral lower extremity 'paralysis' for about 30 minutes." (*Id.*). While in the emergency room, Plaintiff had two episodes in which her "lower extremities became very weak and she 'let' herself down on the floor." (*Id.*). "After a few minutes all the symptoms resolved completely and [Plaintiff was] back to normal again without postictal confusion." (*Id.*). A neurologic exam found that Plaintiff was "oriented to person, place, and time." (R. 292). Dr. Lodi wrote that Plaintiff's symptoms "raise[] suspicion for absent paralysis, seizure, Todd's paralysis." (R. 415). Plaintiff reported past medical history of chronic migraines, Graves' disease, and depression. (R. 291). Dr. Lodi "was present for the entire encounter and was actively involved in the clinical decision-making." (R. 415).

Dr. Lodi treated Plaintiff again on December 31, 2014. She "returned to the clinic and state[d] she ha[d] multiple episodes." (R. 409). Dr. Lodi characterized these as "functional seizures," and "the physical manifestation of the seizure is typical like seizure." (R. 410). He advised that she was not able "to drive" or "work as a cashier" due to her condition. (*Id.*). His management plan included Plaintiff seeking a neuropsychological evaluation and counseling and wrote that Plaintiff "is considered disabled with her current condition." (*Id.*). Dr. Lodi planned to see Plaintiff "on a six-month basis." (*Id.*).

Plaintiff next saw Dr. Lodi on June 24, 2015. (R. 454). She reported that she had "multiple episodes to the point she was not able to drive and sold her car." (*Id.*). She had "a few episodes in the last few days, the last episode was yesterday when she was working." (*Id.*). It "lasted 15 minutes." (*Id.*). Plaintiff had an MRI, and it "showed no change from the spot seen on the [previous] MRI." (*Id.*). Dr. Lodi noted that Plaintiff's "[c]oncentration, attention and memory

appear normal however immediate and remote recall were poor." (*Id.*). Additionally, he noted Plaintiff had "[f]unctional pseudoseizures with increased activity to the point that the patient's activities are reduced." (R. 456). He further noted that "in [his] opinion, this patient will not be able to work any job and is unable to drive." (*Id.*).

In August 2015, Dr. Lodi filled out a "Residual Functional Capacity Questionnaire." (R. 430–32). He diagnosed Plaintiff with "pseudosiezure[s]." (R. 430). Dr. Lodi did not provide a function-by-function analysis. Rather, under each question about function, Dr. Lodi indicated the functional assessments were non-applicable because was "unable" to work or it was "unsafe" for her to work. (R. 430–32).

On January 6, 2016, Plaintiff had a follow-up visit with Dr. Lodi. (R. 451). She reported that she was "doing well" and "the number of pseudo seizures has significantly reduced," though she had one two days before. (*Id.*). She reported "when she goes to shop at Walmart she usually develops seizures." (Id.). On her "problem list," Dr. Lodi listed "seizure disorder." (*Id.*). He also noted that she "had developed pseudo seizures to the point she is not able to work and is homebound. However the number of seizures has significantly reduced." (R. 452).

Plaintiff saw Dr. Lodi again on June 22, 2016. (R. 447). She reported that she was "doing well." Her most recent pseudoseizure was on Father's Day. (*Id.*). Dr. Lodi observed that she was "alert and oriented to person, place and time." (*Id.*). On her "problem list," Dr. Lodi listed "seizure disorder." (*Id.*).

### 2.    Dr. Gilbert Jenouri

Plaintiff met with Dr. Jenouri, a doctor of internal medicine, for a consultative examination on February 4, 2015. (R. 417). Plaintiff reported a history of Graves' disease, hyperthyroidism, eye problems, hypertension, and migraines. (*Id.*). Plaintiff also reported "a history of psychogenic nonepileptic seizure activity" with "episodes every three to seven days"

(*Id.*). Dr. Jenouri wrote that Plaintiff "appeared to be in no acute distress" and that she "[c]an walk on heels and toes without difficulty. Squat full. Stance normal . . . Able to rise from chair without difficulty." (*Id.*). He also wrote that Plaintiff "is restricted from driving and operating heavy machinery." (R. 420).

### 3. Dr. Sara Long

Plaintiff also met with Dr. Long, a psychologist, for a consultative examination on February 4, 2015. (R. 422). Plaintiff reported no psychiatric hospitalizations, outpatient treatment history, or current treatment. (*Id.*). Plaintiff told Dr. Long that she was impaired because of "anxiety" and "seizures every three to seven days." (*Id.*). Following a mental status examination, Dr. Long reported that Plaintiff had clear speech, her thoughts were "coherent and goal directed," and she "displayed a full range of appropriate affect in speech and thought content." (R. 423). Dr. Long did not report any problems with cognitive functioning or memory. (*Id.*). Dr. Long rated Plaintiff's "insight" and "judgment" as "poor to fair." (R. 424). Additionally, "[n]o limitations were observed regarding following and understanding simple directions and performing simple tasks." (*Id.*). Plaintiff was "able to maintain attention and concentration and is able to maintain a regular schedule." (*Id.*). Dr. Long stated that Plaintiff "is capable of adequate stress management, however the nature of her disorder indicated that she is having difficulty managing stress at this time" and "when symptoms are active, presents significant limitations on general functioning." (*Id.*). Dr. Long diagnosed Plaintiff with "adjustment disorder with depression and anxiety" and "conversion disorder." (*Id.*).

### 4. Dr. Thomas Harding

On February 13, 2015, Dr. Harding conducted a record review in connection with Plaintiff's original disability determination. (R. 72–73). He indicated that from his review, Plaintiff did not have a severe mental impairment. (*Id.*).

## 5.    Dr. Christopher Yanusas

Plaintiff underwent a neuropsychological evaluation by Dr. Yanusas, a licensed psychologist, in March 2015. (R. 544). Plaintiff reported that she had "difficulty reading, recalling daily event[s], and misplacing objects." (*Id.*). She also reported post-traumatic stress disorder. (*Id.*). Dr. Yanusas reported that Plaintiff was "alert and oriented to time and circumstances" and that her thoughts were "logical and goal-directed." (R. 545). Her full scale IQ was below average in the 14th percentile. (*Id.*). Her verbal working memory was in the 9th percentile and her visual-motor processing speed was in the 10th percentile. (*Id.*). This "depicted problems with complex attention including verbal and nonverbal working memory and overall mental efficiency." (*Id.*).

Plaintiff's memory was in the "below average range of function on the immediate memory index," which was in the 18th percentile. (*Id.*). Plaintiff had "difficulty organizing contextual and abstract verbal information to encode it into more permanent memory stores." (*Id.*). Additionally, "[a]ssessment of [Plaintiff's] executive functioning yielded scores that fell in the lower extreme to average range." (*Id.*). While "[i]ntermittent difficulties with conceptual flexibility hampered her visual-motor processing speed and ability to solve novel problems," she was able to "formulate concepts and solutions for solving novel problems when her problems with attention were controlled for." (R. 545–46).

Dr. Yanusas opined that Plaintiff "continues to be suffering from premorbid post-traumatic stress disorder and depression. Her psychiatric stress has manifested into pseudoseizures." (R. 546). He further wrote that "[o]bjective testing indicated that [Plaintiff] suffers clinically significant impairment in complex attention that negatively impacts her ability to learn novel information and to multi-task." (*Id.*). When "she attended to and learned information, she was able to retain it." (*Id.*). But her ability to have "adequate

receive/expressive language, visual spatial ability," and "solve problems" is contingent on her "compensat[ing] for her weakness in attention." (*Id.*).

### 6. Dr. Daryl DiDio

On April 20, 2017, Dr. DiDio, a clinical psychologist, completed a "medical source statement of ability to do work-related activities (mental)" after reviewing Plaintiff's record. (R. 535–37). At that time, he did not have access to Dr. Yanusas's report. Dr. DiDio opined that Plaintiff did not have any impairments in her ability to "understand, remember, and carry out simple instructions." (R. 535). He indicated that Plaintiff's "ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine work setting" were "impaired." (R. 536). Specifically, Plaintiff had no restrictions in "interacti[ing] appropriately with the public," no to mild restrictions for "interact[ing] with supervisor(s)," and mild restrictions in "interact[ing] appropriately with co-workers." (*Id.*). Additionally, Plaintiff had mild restrictions "respond[ing] appropriately to usual work situations and to changes in routine work setting," which became moderate "when symptoms are active." (*Id.*).

Dr. DiDio also completed a "medical interrogatory- mental impairment(s)" assessment of Plaintiff. (R. 538–542). He rated Plaintiff as having mild limitations on understanding, remembering, or applying information, mild to moderate limitations on interacting with others, moderate limitations on concentrating, persisting, or maintaining pace, and no limitations on adapting or managing herself. (R. 539). He opined that she "retains the ability to perform simple and moderately complex tasks," "can attend/concentrate [and] maintain a schedule" but that "[l]imitations would include avoidance of high stress environment[s] with strict production requirements." (R. 542).

Dr. DiDio then testified at the supplemental hearing held on July 11, 2017. (R. 33–44). Dr. DiDio stated that he had reviewed the medical evidence, including the report from Dr.

Yanusas. (R. 37). Dr. DiDio then amended his prior report, based on the information from Dr. Yanusas. (R. 38). He testified that he would now rate Plaintiff's limitations as "mild" regarding (1) her ability to understand and remember simple instructions, (2) her ability to carry out simple instructions, and (3) her ability to make judgments on simple instructions. (*Id.*). He also now rated Plaintiff's limitations as "moderate" regarding her ability to carry out complex instructions and to make judgments of complex instructions. (R. 38–39). He reported that Plaintiff's ability to interact appropriately with the public is mildly impaired. (R. 39).

Dr. DiDio testified that he is not a neuropsychologist. (R. 41). He did not have any basis to dispute Plaintiff's diagnosis of PNES. (*Id.*). Dr. DiDio opined that Plaintiff's neurologist has not been able to "rule out any organic factors," and her neurologists have not "been able to be clear on that . . . as to whether or not these seizures are of an organic nature or not." (*Id.*). He testified that based on the record, Plaintiff "is suffering from some form of a seizure disorder, the etiology of which totally remains idiopathic or unknown." (*Id.*). These seizures are "unpredictable," "at least by [Plaintiff's] reports." (R. 41–42). Psychologists typically do not "treat seizure disorders. That's within the specialty of neurology." (R. 42).

### D.     Hearing Testimony from Vocational Expert

At the hearing, vocational expert ("VE") Josiah Pearson classified Plaintiff's past work. He testified that her work as an administrative clerk and postal clerk were "semi-skilled job[s]" and both were "rated at the light level of exertion." (R. 65). Similarly, he rated her customer service manager job as semi-skilled, and the "sedentary level of exertion." (*Id.*). Lastly, he classified her gardening position as "unskilled" and at the "heavy level of exertion." (*Id.*).

### E.     The ALJ's Decision Denying Benefits

On July 31, 2017, the ALJ issued a decision denying Plaintiff's claim. (R. 10–17). In reaching that conclusion, the ALJ applied a "five-step sequential evaluation process for

determining whether an individual is disabled."[5] (R. 10). The ALJ's analysis at each step is summarized below.[6]

### 1.     Steps One, Two, and Three

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since October 7, 2014, the date of her application. (R. 13). At step two, the ALJ determined that Plaintiff had the following severe impairments: "Psychogenic Nonepileptic Seizure Disorder; Graves Disease; Post Traumatic Stress Disorder (PTSD); and Depression." (*Id.*). The ALJ determined that while the record indicated that Plaintiff "has or had hyperthyroidism, migraine headaches, hypertension and Celiac Disease, these conditions cause only slight abnormalities which would have no more than minimal effect on [Plaintiff's] ability to perform work." (*Id.*).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*). Specifically, the ALJ found that "Listing §9.00 is not met or medically equaled because the record does not demonstrate end state damage to the thyroid gland." (*Id.*). Further, "Listing §11.02 is not met because the record does not demonstrate

---

[5] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).
[6] As an initial matter, the ALJ determined that Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2018." (R. 13).

epilepsy." (R. 14). Lastly, the ALJ concluded that the "severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria listing 12.04, 12.07, and 12.15." (*Id.*). In reaching this conclusion, the ALJ found that Plaintiff has: (1) "no more than a mild limitation in understanding, remembering, or applying information," (2) "no more than a mild-moderate limitation in interacting with others and concentrating, persisting or maintaining pace," and (3) "no more than a moderate limitation in adapting and managing oneself." (R. 15).

### 2. Plaintiff's Residual Functional Capacity ("RFC")

Because Plaintiff's impairments did not meet or equal a listed impairment at step three, the ALJ then assessed Plaintiff's RFC.[7] The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record." (R. 15).

In support of the finding and the overall RFC, the ALJ considered that while Plaintiff "testified that she last volunteered at a horse farm in 2011 or 2012, the record indicated that she actually worked at a horse farm as recently as June 15, 2014."[8] (R. 17). Additionally, the ALJ noted that Plaintiff's "activities of daily living seem to indicate that she is more active than alleged," because she is "able to attend to her personal care needs, cook, clean, do laundry, shop, socialize, watch television, listen to the radio, crochet, and work/volunteer at a horse farm." (*Id.*).

---

[7] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

[8] In support of this conclusion, the ALJ cited to medical records from September 15, 2014 that state that "Patient thinks that she has ringworm . . . Her daughter tested positive for ringworm, pt works on a horsefarm." (R. 338).

The ALJ outlined specific items in Plaintiff's medical and treatment history. First, the ALJ discussed how Plaintiff was observed having seizures by medical staff while hospitalized, and it was documented that Plaintiff "remained awake," "was oriented to person, place, and time," and "recovered immediately." (R. 18). An EEG, CT scan, and MRI were normal. (*Id.*). Further, Plaintiff's "neuropsychological evaluation established that if [Plaintiff] attended to and learned the information, she was able to retain it." (*Id.*).

The ALJ assigned the following weights to the various medical opinions contained within the record regarding Plaintiff's limitations:

1. The ALJ gave "great weight" to Dr. Jenouri's opinion that Plaintiff should be "restricted from driving and operating heavy machinery" because he has "professional as well as program expertise, had an opportunity to examine [Plaintiff] and his findings are consisted with the longitudinal record." (R. 18).

2. The ALJ gave "partial weight" to Dr. Long's opinion that Plaintiff has "difficulty with managing stress . . . and when symptoms were active, presented significant limitations in general functioning" because while she has "professional as well as program expertise and had an opportunity to examine" Plaintiff, her opinion was "somewhat vague" and she "based at least a portion of her assessment on [Plaintiff's] statements rather than objective evidence." (*Id.*).

3. The ALJ gave "partial weight" to Dr. DiDio's opinion and testimony regarding Plaintiff's impairments because he "has professional as well as program expertise and had an opportunity to review the record in its entirety," but Plaintiff's "ability to handle stress is more severe than Dr. DiDio identified." (*Id.*). Accordingly, the ALJ found that Plaintiff "is limited to simple work." (*Id.*).

4. The ALJ gave "little weight" to Dr. Lodi's opinion that Plaintiff is "unable to" work and it would be "unsafe for her to" work because "he bases his restrictions on his understanding that [Plaintiff's] seizure manifestations are like regular seizures, but the medical record establishes that this is not the case" because "medical personnel who witnessed [Plaintiff's] seizure-like activity noted that she remained awake" and was "oriented to person, place and time." (R. 20). Further, "Dr. Lodi does not provide a function-by-function analysis in support of his conclusory statements." (*Id.*).

5. The ALJ gave "little weight" to Dr. Harding's opinion that Plaintiff "did not have a severe mental impairment" because he "did not have an opportunity to examine [Plaintiff] or review the entire record and his finding his inconsistent with the significant medical evidence of record." (R. 20).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c)" with the following exceptions:

> [C]laimant cannot work at unprotected heights; climb ladders, ropes or scaffolds; or work in close proximity to dangerous machinery or moving mechanical parts of equipment. The claimant can understand, carry out and remember simple instructions; respond appropriately to supervision, coworkers and usual work situations; and deal with changes in a routine work setting.

(R. 16).

### 3.      Steps Four and Five

At step four, the ALJ determined that Plaintiff "is unable to perform any past relevant work." (R. 20). Specifically, "[a]ll of [Plaintiff's] past relevant work, but for the landscape laborer job, was semiskilled work and as such, exceeds [Plaintiff's] limitation to simple work," and the "exertional level of the landscape laborer position also exceeds [Plaintiff's] residual functional capacity." (*Id.*).

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 21). While Plaintiff has "additional limitations" on her ability to perform "the full range of medium work," the limitations "have little or no effect on the occupational base of unskilled medium work." (*Id.*). This is because Plaintiff's restrictions "are not significant at any exertional level in the broad world of work" and she "retains the ability to perform the[] basic mental demands of work and, therefore, can perform unskilled work." (*Id.*).

**III.    DISCUSSION**

**A.    Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court can reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**B.    Analysis**

Plaintiff argues that the Commissioner erred in two ways in denying her claim. Specifically, she claims that: (1) the Commissioner "fail[ed] to properly evaluate the opinion of treating neurologist Lodi and failed to develop the record by re-contacting Dr. Lodi" and (2) the Commissioner's decision "is not supported by substantial evidence in that the RFC . . . failed to account for the limitations caused by the plaintiff's severe seizure impairment." (Dkt. No. 12, at 3).

**1.    Dr. Lodi's Opinion**

Plaintiff argues that the ALJ "failed to properly evaluate the medical evidence" in two ways. (*Id.* at 14–18). First, the ALJ erred by "according only little weight to the opinion of Dr. Lodi, the plaintiff's treating neurologist," and her failure "to give the required good reasons for

rejecting of the opinion of the treating physician" necessitates remand. (*Id.* at 15). Second, to the extent that the ALJ's decision to afford Dr. Lodi's opinion little weight was based on his failure to give a function-by-function analysis, Plaintiff argues the ALJ failed in her duty to develop the record. (*Id.* at 16).

Because this case was filed before March 27, 2017, when evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).[9] The "treating physician rule" requires that "the opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). "Deference to such medical providers is appropriate" because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ decides not to give the treating source controlling weight, then she must "'explicitly consider' the following, nonexclusive '*Burgess* factors': (1) the frequen[cy], length, nature, and extent of the treatment; (2) the amount of medical evidence

---

[9] The Social Security Administration has revised how it considers and articulates medical opinions. *See* 20 C.F.R. § 404.1520c. Nonetheless, the regulations make clear that "[f]or claims filed before March 17, 2017, the rules in § 404.1527 apply." *Id.*

supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95–96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

If an ALJ fails to assign a treating physician's opinion "controlling weight" and does not explicitly consider the *Burgess* factors, this is "procedural error." *Estrella*, 925 F.3d at 96; *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error."). If the ALJ committed procedural error and has not provided "good reasons" for the weight given to a treating physician's opinion, the court is "unable to conclude that the error was harmless" and should "remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). "If, however, 'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,' [the court] will affirm." *Id.* (quoting *Halloran*, 362 F.3d at 32).

Plaintiff has seen Dr. Lodi—a neurologist—since 2014 and sees him "about every six months." (R. 59). The regulations define a "treating source" as an "acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 404.1527(a)(2). Given these regulations and that the ALJ referred to Dr. Lodi as a "treating provider," the Court assumes that the ALJ considered Dr. Lodi to be a treating physician.

As such, the ALJ was required to either assign Dr. Lodi's opinion controlling weight, or "explicitly consider" the *Burgess* factors. *Estrella*, 925 F.3d at 95–96. The ALJ assigned Dr. Lodi's opinion "little weight," (R. 20), and after doing so, failed to explicitly articulate consideration of all the required *Burgess* factors. While the ALJ arguably applied the second and

third *Burgess* factors—the amount of medical evidence supporting Dr. Lodi's opinion and the consistency of his opinion with the remaining medical evidence—she did not explicitly consider Dr. Lodi's specialty, neurology, or discuss the "frequen[cy], length, nature, and extent of treatment." *Estrella*, 925 F.3d at 95 (quoting *Selian*, 708 F.3d at 418). Accordingly, the Court finds that the ALJ committed procedural error. *Id.* at 95–96.

Thus, the Court must determine if "the substance of the treating physician rule" was "traversed" by examining whether "the record otherwise provides 'good reasons' for assigning 'little weight'" to Dr. Lodi's opinion. *Id.* at 96. In this case, the ALJ explained that she gave little weight to Dr. Lodi's opinion because he based "his restrictions on his understanding that [Plaintiff's] seizure manifestations are like regular seizures, but the medical record establishes this is not the case." (R. 20). The ALJ opined that "medical personnel who witnesses [Plaintiff's] seizure-like activity noted that she remained awake; was oriented to person, place and time; had fluent speech; had no neurological deficits; and had full motor strength with no incoordination." (*Id.*). Further, the ALJ assigned little weight because Dr. Lodi did "not provide a function-by-function analysis in support of his conclusory statements." (*Id.*).

The Court finds that the ALJ did not articulate "good reasons" for assigning Dr. Lodi's opinion little weight. *Estrella*, 925 F.3d at 96. The ALJ opined that the medical record "establishes" that Dr. Lodi is incorrect that Plaintiff's seizures "are like regular seizures." (R. 20). The only reason given for this opinion is that medical personnel witnessed Plaintiff's "seizure-like activity" in October 2014. (*Id.*). The ALJ seemingly failed to consider that Dr. Lodi was one of the medical personnel who witnessed Plaintiff's seizures. (R. 409). After witnessing these seizures, Dr. Lodi—who has a specialty in neurology—concluded that Plaintiff has "functional seizures" which make Plaintiff "not capable of driving or undergoing any procedures

or activity of work since the patient's physical manifestation of the seizure is typical like seizure." (R. 410). The ALJ failed to point to any other evidence in the record to suggest that Dr. Lodi is incorrect in "his understanding that [Plaintiff's] seizure manifestations are like regular seizures." (R. 20). *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) ("Neither the trial judge nor the ALJ is permitted to substitute [their] own expertise or view of the medical proof for the treating physician's opinion."). Indeed, Dr. DiDio testified that psychologists—including himself—"don't really treat seizure disorders. That's within the specialty of neurology," and that Plaintiff "is suffering from some form of a seizure disorder, the etiology of which totally remains idiopathic or unknown." (R. 41–42). The ALJ therefore did not articulate a "good reason" to reject Dr. Lodi's opinion that Plaintiff suffers from a seizure disorder and that disorder renders her disabled.[10]

The ALJ's second reason for discounting Dr. Lodi's opinion—that he did "not provide a function-by-function analysis in support of his conclusory statements, which speak to an issue which is reserved for the Commissioner"—is also not well-founded. (R. 20). In his assessment Dr. Lodi described his diagnosis as pseudoseizure, and wrote that Plaintiff was unable/unsafe to work. (R. 430–32). Accordingly, he did not complete a functional analysis. As the Commissioner notes, Dr. Lodi "intentionally crossed out/marked the areas of the assessment that asked him to provide a function-by function analysis," writing "NA" in the margins. (*Id.*; Dkt. No. 14, at 9

---

[10] Defendant's argument that Dr. Lodi's opinion should be assigned little weight because it is "inconsistent with the medical evidence and other evidence as a whole" and "unsupported by his own treatment notes" is unavailing. (Dkt. No. 14, at 14). First, the opinions of Drs. Jenouri and Long are not inconsistent with Dr. Lodi's opinion, given that they did not examine Plaintiff while she was having a seizure or shortly after (unlike Dr. Lodi). Second, Dr. Lodi's treatment notes are not inconsistent with his ultimate opinion. While one note suggests that Plaintiff may have had a seizure while working, (R. 454), the fact that she was potentially working at the time and a seizure disrupted that work does not undercut Dr. Lodi's ultimate opinion that her seizure disorder renders her unable to work. Additionally, while Dr. Lodi's treatment notes from 2015 to 2016 do suggest some improvement to Plaintiff's condition, (*see* R. 451–52), Dr. Lodi nonetheless notes that "while the number of seizures has significantly reduced," Plaintiff has "developed debilitating pseudo seizures to the point she is not able to work and is homebound." (R. 452).

n.6). To the extent the ALJ thought Dr. Lodi's opinion was too conclusory and insufficient, the ALJ had a "duty to develop the record." *Parker v. Comm'r of Soc. Sec. Admin.*, No. 18-cv-3814, 2019 WL 4386050, at *8, 2019 U.S. Dist. LEXIS 156826, at *24 (S.D.N.Y. Sept. 13, 2019) (collecting cases and holding that a treating physician's failure to provide a function-by-function analysis does not provide a "good reason" for discounting his opinion, given an ALJ's duty to develop the record); *see also Santiago v. Comm'r of Soc. Sec.*, 413 F. Supp. 3d 146, 156 (E.D.N.Y. 2018) (same). "An ALJ has an affirmative duty to develop the administrative record . . . even when the claimant is represented by counsel because social security disability hearings are non-adversarial." *Parker*, 2019 WL 4386050, at *5, 2019 U.S. Dist. LEXIS 156826, at *13 (citing *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009)). This duty to develop the record may include re-contacting the treating physician "[i]f the opinion of [the] treating physician is not adequate." *Id.* (citing *Mitchell v. Astrue*, No. 07-cv-285, 2009 WL 3096717, at *17, 2009 U.S. Dist. LEXIS 89440, at *47 (S.D.N.Y. Sept. 28, 2009)).[11] Here, the ALJ did not have a good reason to discount Dr. Lodi's opinion because if she felt that his opinion was insufficient, she had a duty to further develop the record.

Further, the fact that Dr. Lodi opined "on an ultimate issue reserved for the Commissioner"—that Plaintiff was disabled and unable to work—"does not justify discounting his opinion." *Parker*, 2019 WL 4386050, at *8, 2019 U.S. Dist. LEXIS 156826, at *25. While a treating physician's opinion "on such an ultimate issue" need not be credited, the ALJ still had

---

[11] ALJ's have some "flexibility" in "resolving an inconsistency or insufficiency" in a treating physician's opinion. *Perrin v. Astrue*, No. 11-cv-5110, 2012 WL 4793543, at *3 n.3, 2012 U.S. Dist. LEXIS 145396, at *9 n.3 (E.D.N.Y. Oct. 9, 2012) (citing 20 C.F.R. §§ 404.1512). While ALJs are no longer required to recontact the medical source, they nonetheless "must attempt to resolve the . . . insufficiency" by "(1) recontacting the treating physician or other medical source, (2) requesting additional existing records, (3) asking the claimant to undergo a consultative examination, or (4) asking the claimant or others for further information." *Id.* However, "in some cases, the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record." *Gabrielsen v. Colvin*, No. 12-cv-5694, 2015 WL 4597548, at *6, 2015 U.S. Dist. LEXIS 99806, at *16 (S.D.N.Y. July 30, 2015). Here, there is no indication that the ALJ attempted to resolve the perceived insufficiency.

an obligation "'to explain why a treating physician's opinion is not being credited.'" *Id.* (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). The ALJ had a duty "to provide good reasons why she, unlike [Dr. Lodi], concluded [Plaintiff] could work." *Id.* Furthermore, "[i]t is entirely possible that [Dr. Lodi], if asked, could have provided a sufficient explanation for any seeming lack of support for his ultimate diagnosis of complete disability." *Id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999)).[12]

Defendant argues that the ALJ did not err because "there is no requirement for an ALJ to recontact a treating source when the record is complete and contains enough evidence for the ALJ to render his decision." (Dkt. No. 14, at 10). According to Defendant, because the ALJ considered "treatment records" as well as "multiple opinion statements" from other medical sources, the ALJ "possessed sufficient medical evidence to render a decision." (*Id.* at 11–12). This argument is unavailing. The record did not contain any other medical statements from neurologists. These other sources largely spoke to Plaintiff's mental impairments, rather than her physical impairments resulting from her "functional seizures." *See Sims v. Shalala*, No. 94-cv-2337, 1995 WL 428709, at *7 (E.D.N.Y. July 5, 1995)[13] (noting that the doctor was "the only neurologist who examined plaintiff," and "[a]s plaintiff is arguable suffering from a neurological condition," the doctor's opinion was "entitled to greater consideration"). The record therefore did not contain sufficient evidence to allow the ALJ to discount the opinion of Dr. Lodi.

---

[12] Defendant argues that "apart from Dr. Lodi's perfunctory conclusion, the record is absent of any narrative assessment or treatment note by Dr. Lodi wherein he supports his conclusion that Plaintiff was incapable of working." (Dkt. No. 14, at 13). The Court disagrees. Dr. Lodi's notes include a diagnosis of "functional seizures," based on Dr. Lodi's first-hand observations of the seizures, and his observations that the "physical manifestation of the seizure is typical like seizure." (R. 409–10). Based on these observations and his interactions with Plaintiff, Dr. Lodi opined that Plaintiff "will not be able to drive and not be able to operate machinery and not [be] able to work as a cashier." (R. 410).

[13] No Lexis citation available.

Accordingly, the Court reverses the ALJ's decision based on her failure to offer good reasons for discounting the opinion of Plaintiff's treating physician. On remand, the ALJ must expressly consider each of the *Burgess* factors, further develop the record as needed, and provide good reasons for the weight assigned to Dr. Lodi's opinion.

### 2. Remaining Argument

As remand is required, the Court does not reach Plaintiff's remaining argument that the "decision of the ALJ is not supported by substantial evidence." (Dkt. No. 12, at 18).

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order;

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: February 24, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge